May it please the Court, Your Honors, my name is David Urtiago. I represent Mr. Michael Germain, who is the plaintiff and the appellant in this case, and we're asking the Court to And with my time here today, I want to focus my remarks on four topics that I know there's a lot of issues that are being presented in the briefs. The first topic I wanted to focus in on is whether or not Ocwen's conduct in connection to a loss mitigation application submitted in February of 2014 was compliant with the regulation at issue. The regulation at issue, of course, is a regulation that was implementing RESPA, and it's codified at 12 CFR 1024.41. Now, to the extent that Ocwen's conduct in February of 2014 did not comply with the regulation, then that arises the second issue that I wanted to discuss, which is to what extent, then, can the Court look at conduct that Ocwen had in 2012 and 2013 to find that compliance? As Your Honors are probably aware from the briefing in this case, the effective date of the regulation was in January 10, 2014, and so really what the second issue is focused in on is to what extent is there a retroactive application of the regulation? Now, to the extent that Ocwen's conduct in 2014 was not compliant and the Court determines that Ocwen cannot rely upon preregulation conduct to excuse it from further compliance, then that really comes to the third issue, which is whether or not Mr. Germain gave at least some evidence that he suffered compensable damages as a result of the violation of the regulation. And then finally, Your Honors, time allowing, I want to hit upon the fourth issue, which is whether or not Mr. Germain has a viable claim under the Texas Debt Collection Act, which is codified in the Texas Finance Code. So to start with the first issue, which is whether or not Ocwen's conduct in February of 2014 complied with the regulation at issue, and Your Honors, just to be blunt, the answer is no. And not only is the answer no, but in fact, I don't even think Ocwen's trial counsel thought the answer was yes, because Ocwen's trial counsel argued in its motion for summary judgment that it was really the cumulative conduct in 2012, 2013, and 2014, which arose the compliance with the regulation. And indeed, as Your Honors are probably well aware, the lengthy opinion issued by the district court, which is over 30 pages, a significant portion of that opinion was going to whether or not the court could appropriately look at conduct in 2012 and 2013 to find that compliance. So really this new argument that's being raised for the first time on appeal by Ocwen was an argument that was never really considered in the district court, and for good reason. And the answer is because in February of 2014, Ocwen's conduct was facially and obviously noncompliant with the statute. And Your Honors, the statute that we're talking about, and by statute I mean the regulation, it only really requires three things. First, it requires that once it receives a compliant loss mitigation application, which there's no dispute actually happened in this case, it requires a loan servicer, in this case Ocwen, to review the borrower for all available loss mitigation options, and then two, give written notice to the borrower of what loss mitigation options it will be provided to the borrower. And it needs to do all of those things in 30 days. So that's all we're talking about. In this case, what happened is that Mr. Germain submitted a loss mitigation application to Ocwen in February of 2014. Ocwen looked at it, generated a form letter that says we deny any request for a loan modification, but we provisionally grant you or at least provisionally approve you for a short sale. What was obviously missing from that, and this is just the low hanging fruit, is that there was no reference whatsoever to a forbearance or repayment plan. And number two, there was no reference to any sort of deed in lieu, which was those are two options which, as the record demonstrates, were available to Mr. Germain. And, Your Honors, I just want to point you out to a record citation because we actually took the deposition of the corporate representative for Ocwen, and this is at page 927 of the record, and the question was this. So is it Ocwen's position that even though they sent him a denial letter in February 2014 based on his February 2014 application that they were still considering him for a forbearance at that time? The answer was yes. So what happened here is that Ocwen was still considering Mr. Germain for other loss mitigation options available to him at the time it served the notice saying that this is all we're going to offer you. So the statements that were made in the letter in February 2014 were demonstrably and factually incorrect. In fact, there doesn't seem to be much contention or argument that those statements were incorrect. In fact, Ocwen's position, if I'm understanding their briefs correctly, is that they're allowed to give factually incorrect statements in these letters and still be compliant with the statute. How many times did your client apply for mitigation? Based off this record, it is three times. The first time is 2012. The second was in 2013. And then the third time was February 2014. And how many years ago was the mortgage executed? Your Honor, I do not remember when the mortgage was originated. It was about eight years, wasn't it? That sounds about right, but I don't have that information in front of me of when the mortgage was originated. So without paying on the mortgage, your client has played the game of the system to occupy a house without paying on the mortgage for about eight years? Well, that is not correct because Mr. Germain, and just real quick to correct my prior statement, he sent a fourth application in November of 2014, and that's in the record. The reason why I'm saying that's incorrect is because Mr. Germain, of course, the last time he was current was I want to say approximately 2013 when he filed for bankruptcy. Of course, he had defaulted in 2013, and then he submitted the February of 2014 application. And so based off of my understanding of the record, he had not been current probably since about 2013, the beginning of 2013. However, I can't tell you, your Honor, when the loan was originated, so it may be that he had the loan for some prior time before that. But to, I think, address the issue that your Honor is bringing up, which is the idea of gaming the system, because that is obviously one of the focus of Ocwen's position. Your Honor, the statute or the regulation at issue does not provide an onerous burden. All it requires is that the mortgage servicer review the application, review the borrower for all options available to him, and then give written notice of that and then do that within 30 days. And so the regulation was designed to provide a uniform procedure for loss mitigation where the borrower has admittedly defaulted, but the mortgage servicer is required to at least work with the borrower to provide some minimum protections for the borrower to prevent foreclosure. So that's all we're talking about here. It may be that Ocwen could very well and very easily have done that procedure and probably should have done that procedure, of course, in February of 2014, added a few extra sentences in its letter, did a few extra steps within the 30-day time period, and then we would have no cause of action and there would be no reason for us to be here arguing about this case today. But Ocwen failed to do that. The remedy, of course, pursuant to the statute, is that if you don't comply with the regulation, is that you can't move forward with foreclosure until you comply with the regulation. And so, Your Honors, just moving on to the second issue I wanted to hit upon, which is to what extent Ocwen can rely upon a preregulation conduct in order to find that compliance. So what had happened in the district court was that Ocwen argued saying, yes, Mr. Germain was eligible for several forms of loss mitigation, including a forbearance or a payment plan, including a deed in lieu and a short sale, and we considered him for all of those options, but we considered him for those options over the course of approximately three years, 2012, 2013, and then 2014. Your Honor, the effective date of the regulation wasn't until January 10, 2014. I have cited in the briefs a host of cases across the nation from the district courts which have for the great weight would hold that a loan servicer is required to comply with the regulation at least once since the effective date of the regulation. And so all of the conduct that occurred in 2012 and 2013, which is relied upon by Ocwen, is simply not relevant and simply can't be relied upon Ocwen. And, Your Honor, there's also a different point that needs to be made, which is there can also not be piecemeal compliance, meaning that you can't review a borrower for two of the three options that he or she may be available to him in 2012 and then go ahead and review the borrower for that third option. What's the source of that rule? Well, that's just straight from the regulation. The regulation at issue, Your Honors, and just quoting it here, it says the loan servicer must provide the borrower with a notice in writing stating the servicer's determination of which loss mitigation options, if any, it will offer to the borrower. And, of course, the previous subsection says that a loan servicer is under the duty to evaluate the borrower  How does that eliminate prior compliance? Oh, in terms of prior conduct? Well, the reason why I was making the argument that we cannot or the court should not look at conduct occurring prior to the regulation is really just because the regulation didn't come into effect until January 10, 2000. But just before my previous question, you said that it all had to be done in one time. Yes. And not piecemeal. That is correct, Your Honors. But you haven't given us the statutory or the legal basis for that. Your Honor, I cannot point to the court to any case which has held that. The reason, the basis for the legal argument that I'm making regarding piecemeal compliance is based in the statutory language. And the language simply says that once a borrower submits a timely, complete loss mitigation application, the servicer must, one, evaluate the borrower for all loss mitigation options available to the borrower, and then, two, give written notice. And so the only way that that regulation makes sense is that considering that the duty doesn't trigger until upon the receipt of a loss mitigation application, from a timing standpoint it would just make sense from just the plain reading of the statute that an application is served, step one. Step two, then evaluate the borrower for all loss mitigation options available. And then step three, give written notice, do all of that within 30 days. Because there is a 30-day time period being provided in the language itself. It says within 30 days of receiving the complete loss mitigation application, a servicer shall, colon, and then step one, step two. So based off of just the plain meaning of the language in the regulation, I would contend, certainly Mr. Germain contends, that there cannot be piecemeal compliance. You can't simply essentially fail to comply with a loss mitigation application served in a prior date and then rely upon that conduct to cumulatively comply with a subsequent application given at a subsequent date. Your Honors, moving to the issue of damages, because I know this was also a large issue being brought on by the appellees, the violation that we're alleging in this case, of course, is that you can't move forward with foreclosure until there has been compliance under the regulation. And, of course, Mr. Germain has argued that and believed has shown through the evidence that there has not been compliance with the regulation. And so that is why the evidence that we submitted flowed from that violation. So as a result of the attempted foreclosure at a time when foreclosure was not allowed pursuant to the regulation, that is what arises, the damages, which, of course, are in the record as well, particularly Mr. Germain's affidavit. And finally, Your Honors, I wanted to hit upon the issue of the Texas Debt Collection Act because there's a separate legal argument being made, and that is whether or not there's an exemption for threats to foreclosure under the Texas Debt Collection Act. There is. However, this Court in McCaig v. Wells Fargo, for example, found that to the extent that a loan servicer did not have a contractual right to foreclose but then threatened foreclosure nonetheless, that that would essentially avoid any sort of exemption under the Texas Debt Collection Act. Of course, the Court in Rucker, a separate case which came shortly thereafter, McCaig v. Wells Fargo, would indicate that just because there's an argument that someone failed to comply with a notice in the Texas Property Code, then that would not somehow waive a contractual right to foreclosure. The reason why this case is very much different from the Rucker case is that we actually have a regulation which mandates that foreclosure cannot occur and foreclosure cannot be moved forward until there has been compliance with the regulation. And, of course, the deed of trust, the actual language of the deed of trust that is underlying in documenting the loan is subject to applicable law pursuant to just the plain language of those terms. And so the actual contract they were arguing about is subject to the regulation that we're arguing about as well. So to the extent that the regulation hasn't been complied with, the actual language of the underlying deed of trust would indicate that there's no right to foreclose. Thank you, Your Honors. Thank you, sir. May it please the Court. I'm Susan Kidwell here for the Appellees. I'd like to talk about three things. I'd like to begin with the loan history because I think that that bears on the issues of no duty and also the issues of no waiver, which are issues that were brought up. Second, I'd like to really focus on the 2014 response because I think our compliance with the rest of our regulation requirements in February of 2014 essentially moots any need for this Court to consider some of the more difficult issues presented in the appeal. And then third, I'd like to just briefly explain why we were not prohibited from moving forward with foreclosure in 2015. With respect to the loan history, this is a loan that's been in and out of default since 2009. Mr. Germain made his first loss mitigation application in 2012 and then promptly made a fairly big payment on the loan, which essentially stopped any further review. So that was the first attempt. In 2013, he requested another loss mitigation, and both times, in 2012 and 2013, we told him that we could not do a loan modification because his lender does not allow that. It's just a lender policy. But in 2013, we gave him an option of a deed in lieu of foreclosure as a way of avoiding foreclosure because in 2013, again, he's very behind on his mortgage and he's been having problems now since 2009. And in 2013, what did he do? He didn't accept our offer. Instead, he said he was going to file for bankruptcy to make things as difficult on Ocwen as possible. And he did. His bankruptcy petition was eventually dismissed because he didn't do all of the paperwork that one needs to do to stay in bankruptcy. And so 2014, we get to February of 2014, and again, he's having problems with his payments. In fact, he hadn't made a payment since 2013, period. He's been living in his house since 2013 with no payments. So this loan history, I think it explains the relevance of the 2012 and 2013 loss mitigation applications, and I think it shows why the district court was influenced by those because the district court, probably picking up on this court's decision in Wentzell, said, look, in 2014, this was already the third loss mitigation application. So there's really no duty to comply with the regulations. And whether the district court went on and ruled based on other applications is not entirely clear, but I can say that our motion for summary judgment was based on the ground that we complied with RESPA. We actually said we complied not once, not twice, but three times. So we were not arguing for piecemeal compliance. We were saying that we complied multiple times, and so this isn't the kind of case that can support a RESPA claim. Our motion was also based on an argument that there was no evidence of any actual damages that resulted from the alleged violations that were at issue. So really the motion itself, and all the court needs to do is just look at that very briefly, you can see that all of the issues we've briefed to this court were preserved. So we're not arguing piecemeal compliance. We're actually saying the simplest way the court can resolve this case is to focus on the February 2014 response and say, okay, by then the regs had just taken effect, but this response clearly complies. So you don't... How do you stand on the retroactivity of the regulation? I don't think that it's an issue of retroactivity because nobody is trying to apply the requirements in the regulation retroactively. I think the law is clear that the requirements don't apply until the reg takes effect. What we're saying, and I think what the district court was saying, is that those requirements only apply to the first loss mitigation application. So our answer is it's not that anybody's trying to apply the reg retroactively. The reg is just limited into how it applies going forward. It doesn't apply to a third application. But, again, I don't think... And there's authority going both ways on that, so I think that would actually be a more difficult question for the court to consider. I would just look at the response that we have to the February 2014 application. It's on page 11 of our brief, and it's on page 752 of the record. And we've clearly got a written response. It's clearly timely because it's done within 30 days of his application. It says that Ocwen has evaluated the borrower for all loss mitigation options. I think what's key to that is you need to look at the Bureau's official interpretation to see what the Bureau is saying that means. The Bureau says a mortgage servicer's evaluation is in the sole discretion of the servicer, and the options that are available are the options that are offered at that time. So, in other words, the fact that we might have offered the borrower a deed in lieu back in 2013, that option wasn't available in February 2014 because we only offered one option. We offered the option of a short sale. The fact that Mr. Germain then started contacting us, asking about options that weren't available and hadn't been offered, and that later on we offered a forbearance which he rejected, again, that doesn't mean that that option was available in 2014. As a matter of law, it wasn't. We know that based on the written response saying that we can offer you a short sale, and we know that from the Bureau interpretation that says the options available are those offered. So I think that that's just a very clean answer to the question, you know, did we... Deposition of the corporate representative who said we didn't consider him, we didn't consider X, Y, Z. She's got some... You sort of have to look at the whole thing. She does have some statements that have been taken out of context where she's saying, you know, yes, at that time we were considering him for a forbearance. And I think when you look at the written record, it looks like we started... Well, doesn't matter. The fact that we're considering him for a forbearance at the time of his application, it doesn't mean that it was an option that was available at that time because, as even the other side has acknowledged, parties went back and forth for about five months before they could come up with anything remotely, you know, possible given this borrower's loan history. A forbearance, repayment options, I mean, he had already been demonstrating for five years that he was unable to make the payments that he had, and so there was really just no workable plan. You know, again, I think the fact that we continued working with him for another five months and then did offer him a forbearance plan, which he rejected, I think that that really just goes to show... Again, it's back to the big picture. This is a borrower who was really having problems with his mortgage, and Ockwin was trying repeatedly over a course of years to give him alternatives, none of which he took. Now, Judge Owen, if at the end of the day you think, well, this corporate rep, you know, this raises some questions, then I would say, well, what damages could possibly flow from the fact that we did not offer an option that was not available in February 2014 because we needed to evaluate, but what damages could possibly flow from that? He didn't accept the offer anyhow. So it's not like a situation where, oh, gosh, he would have qualified for a forbearance in February 2014, but we didn't offer it, and then he lost his house and then he lost his job, and then we said, oh, yeah, we could have offered that. That's not what happened. We didn't offer it in 2014 because it wasn't available at that time. Continued negotiations. Again, ongoing history of this loan. It's just like once we respond to one application, then he's immediately calling or writing asking for something else. So we continue evaluating. You know, forbearance is ultimately offered, but then he doesn't accept it. Why was forbearance available later but not in February of 2014? I mean, I think as the regs make clear, options that are available are considered in terms of what's available at that time. You know, there's nothing in the record to explain the rationale as to why one option is available, but I think it just has to do with the calculations that the servicer makes given the loan history. You know, at one point, they were willing to take a deed in lieu. Once he's rejected that, then that was off the table. I think that basically the forbearance and repayment plan, I mean, they just weren't workable for his loan history, which is ultimately what... You didn't offer forbearance at one point after 2014, after February 2014, right? We offered it about in July of 2014. And he made payments in between? No. No. And it was going to be a significant... It was a plan that was going to require him to make a very significant upfront payment, which, of course, he couldn't do, which is, frankly, probably why we didn't offer it in the first place, because it just wasn't a viable plan for him. But he kept insisting in wanting something else, so we offered that. You know, again, we think that the notice on its face complies, but even if not, the kind of hyper-technical violations that we're talking about are failing to evaluate him for options that weren't available at the time. Again, service or sole discretion. Options offered are the only options available. I mean, that's what the Bureau... That's how the Bureau interprets this requirement. So, you know, why we exercised our discretion in certain ways, there's nothing in the record to speak to that. Bottom line is, we did offer one option in February 2014, and he didn't take it, just as he hadn't taken any other option at any other time. The third thing I'd like to touch on is this idea that we were prohibited from foreclosing until we had issued a compliant notice. That is simply incorrect. The regulations say that a borrower or a servicer can't proceed with foreclosure unless one of three things happens. And the first one is, the borrower issues a response to a loss mitigation application and offers no options at all. And if that happens, then you've got to wait till the time to appeal has been exhausted, so the time to appeal expires, or if the borrower files appeal, you've got to wait till the appeal is resolved. That's not what happened, because in February 2014, we did offer an option. So that takes us into the second and third possibilities. A servicer can't proceed with foreclosure unless the borrower rejects all loss mitigation options offered by the servicer. That's exactly what happened. We offered a short sale. He rejected it. But we still didn't even proceed with foreclosure then. We waited. He filed another loss mitigation application in November of 2014. By that point, we had already offered him deed in lieu, short sale, forbearance. We had talked about repayment plans, none of which were workable. So we said there were no options available at that point. His time to appeal expired, and at that point we proceeded with foreclosure. So the regs... And I guess the third thing is the regs say that you can't... A servicer can't proceed with a foreclosure unless the borrower fails to perform under an agreement or a loss mitigation option. And this is all in... It's subsections F and subsections G of the regulation. You'll see all those. And the official Bureau interpretation sheds some light on that and says, quote, if a borrower has not obtained an approved short sale transaction at the end of any marketing or listing period, a servicer may determine that a borrower has failed to perform under an agreement on a loss mitigation option. So, you know, whether we're in Category 2 or Category 3, whether he just rejected our offer of a short sale or whether he failed to perform, either way, OCWIN was not prohibited from foreclosing. In fact, they were permitted just by the express language of the regulations. So this kind of bootstrapping, saying that, you know, we're liable under the TDCA because we violated RESPA, that assumes that we couldn't foreclose under RESPA, and, in fact, RESPA gives us the exact authority to do that. Unless the Court has any questions, we'll stand on our briefs. Thank you. Thank you. Your Honors, I just wanted to focus first on the issue of how to interpret the phrase options available. Counsel for OCWIN indicates that, essentially, you know, if Mr. Germain would not have been authorized or approved for some form of loss mitigation, then somehow that was, quote, a not option available, and they were never required to give written notice of its decision in the first place. That's not what the statute contemplates. It's not what the plain meaning of the regulation indicates. In fact, I would urge the Court to look at the official interpretations of what it means by options available, and typically what that means is that whatever typical loss mitigation options are going to be offered to the loan servicer's customers are the, quote, options available. And that makes sense, of course, is because why would the loan servicer ever need to give notice in the first place if options available is simply referring to options approved? Because, of course, the regulation contemplates denials, which is a fact. What has been happening to Mr. Germain every time he asked for a loan modification, they sent him a notice saying option denied. That was a, quote, option available, but it was not a, quote, option approved. And so certainly counsel for Ockman's interpretation of what options available, quote-unquote, is supposed to mean is just not supported by the official interpretations of the regulation, is not supported by... Are you saying they have to offer everything, or they have to say these options, list them, and say these are available but not to you? Your Honor, options available, as contemplated by the regulation, and as instructed by the official interpretation, simply means whatever loss mitigation options are generally available to the customers of the loan servicer. So, for example, from the millions of people that Ockman services, it may be that some borrowers are going to be approved for a loan mod, some borrowers may be approved for a forbearance, some borrowers may be approved for a deed in lieu. That doesn't mean all borrowers are going to be approved for all, quote, options available, but that doesn't excuse Ockman from considering all borrowers for all, quote, all options available. So there's a distinction between what we are referring to as options available and ultimate approval for loss mitigation. Why is that an important distinction? Well, it's an important distinction because Mr. Germain was dramatically and just very obviously not considered for, quote, all options available. In fact, the corporate representative indicated that he was being actively considered for a forbearance agreement, and he wasn't being considered for a deed in lieu because, according to the corporate rep, Mr. Germain at some time in the past had indicated that he wanted to keep the property. Well, that's still not compliant under the regulation. The regulation provides a very uniform method of processing loss mitigation applications, and it's there for a specific reason to provide very minimum basic protections to borrowers in these sorts of cases where they're facing foreclosure. And so the options available to Mr. Germain in February of 2014, pursuant to what that term means, includes loan modification, includes deed in lieu, includes short sale, includes forbearance agreement. Now, in terms of what options Mr. Germain would have been approved for, well, that's ultimately at the discretion, at the servicer, after a review of, quote, all options available. So you're saying they should have listed, here are options available, but we're not going to make any of these available to you? Your Honor, I'm not going to say that the loan servicer in its notice needs to list all options available. What the loan servicer needs to do is at least review the borrower for all options available and then in the written notice indicate which options he or she has been approved for. In this case, and that's why Aukman's counsel really focused on the form language in the letter, because the letter actually says we have considered you for all options available and we hereby offer you this one option. So what you're taking as a factual matter, you're saying they lied. That is correct. As purely a factual matter, he was found out in discovery that . . . Every time we get a notice that says we've considered all options and you don't qualify for any of them, we can stop the foreclosure and take depositions to see if, in fact, they did consider the person for all these options? Your Honor, I'm not going to say that those things have to happen, but does . . . How else would you, I don't see how else you can comply? I mean, in other words, it seems like you're saying you have to have the right to go behind it and say, well, did you really, in fact, consider me? I believe a borrower, to the extent that there is some good faith basis to file a lawsuit that, in fact, the borrower was not considered for all options available, then the borrower would have a credible claim for a violation of the regulation, which may be proven out in discovery. In this case, Mr. Germain knew . . . All right, what should they have been . . . All right, they say they considered him. What would he have been available for had they considered it? The number one would have been the forbearance or the repayment plan. Another option would have been a deed in lieu, for example. As of February of 2014, what prospect was there of a repayment plan? Probably almost 100%. Why? That's because they are actively considering him for that repayment plan at that time, pursuant to the testimony that we've seen, and eventually they did send out some form of a repayment plan some five months later, which, again, is a violation of the regulation, which requires that review and that offer to be made within 30 days. So there is plenty of evidence, and the record indicates that there was a high probability that Mr. Germain would have been offered that forbearance plan within that 30-day period if Aukman had complied with the regulation. Would he have accepted it? Could he have accepted it? Your Honor, Mr. Germain . . . Except the one that was made five months later. Which, again, was based off of different circumstances and not the circumstances in February 2014 because, Your Honor . . . go ahead. What circumstances were different? A accruing default under the mortgage. So what's happening here . . . So you're saying you can produce evidence that had they made a forbearance offer with a repayment plan in February 2014, there's evidence he could have complied with that. Your Honor, I would say that that was not the argument that was being made in the district court, and the reason why I'm saying this is because I don't have the record to make that argument to you today. So all I can tell you is that we would love to make that argument in the district court, but I don't have the record to indicate whether or not Mr. Germain could have complied with a forbearance agreement in February 2014. I just don't know. And, Your Honor, I see that my time is up. If there's no further questions, we would ask that the Court of Appeals would reverse the granting of the summary judgment in this case. Thank you, Your Honor. Thank you, sir.